520 F.2d 420
 11 Fair Empl.Prac.Cas. 38, 10 Empl. Prac.
Dec. P 10,357
Edward L. KIRKLAND and Nathaniel Hayes, each Individually
and on behalf of all others similarly situated,
Plaintiffs-Appellees,
v.
The NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES et
al., Defendants-Appellants,
and
Albert M. Ribeiro and Henry L. Coons, Intervenors-Appellants.
 Nos. 445, 499, Dockets 74-2116, 74-2258.
 United States Court of Appeals,
Second Circuit.
 Argued April 21, 1975.
Decided August 6, 1975.
 
 Judith A. Gordon, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen., of N. Y., Samuel A. Hirshowitz, First Asst. Atty. Gen., Stanley L. Kantor, Asst. Atty. Gen., New York City, of counsel), for defendants-appellants.
 Richard R. Rowley, Albany, N. Y. (Sneeringer & Rowley, Albany, N. Y., of counsel), for intervenors-appellants.
 Deborah M. Greenberg, New York City (Jack Greenberg and Morris J. Baller, New York City, of Counsel), for plaintiffs-appellees.
 Arnold Forster, New York City (Joy Meyers, and Justin J. Finger, New York City, of counsel), for amicus curiae, Anti-Defamation League of B'nai B'rith.
 Before HAYS, TIMBERS and VAN GRAAFEILAND, Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge:
 
 
 1
 On October 14, 1972, the New York State Department of Civil Service offered examination 34-944 for promotion to the position of correction sergeant in the New York State Department of Correctional Services. One thousand, two hundred sixty-three white correctional officers took this examination, and three hundred eighty-nine, or 30.8%, received a passing score. Of the one hundred four Blacks tested, eight, or 7.7% passed; of the sixteen Hispanics, two, or 12.5% passed. Thus was this litigation born.
 
 
 2
 On April 10, 1973, Edward Kirkland and Nathaniel Hayes, two Black officers who failed, joined with the Brotherhood of New York State Correction Officers, Inc., in instituting this civil rights class action[1] on behalf of their similarly situated fellow officers, seeking to enjoin any promotions to sergeant based on the results of the examination.
 
 
 3
 The case was tried before Judge Lasker in July of 1973, and this appeal is taken from his order and decree. Basically, the order provided as follows:
 
 
 4
 1. It declared examination 34-944 invalid as unconstitutionally discriminatory and enjoined defendants from making any appointments to sergeant based on the results thereof.
 
 
 5
 2. It mandatorily enjoined defendants to develop a lawful, non-discriminatory selection procedure for the position of sergeant, requiring that it be validated in accordance with the E.E.O.C.[2] Guidelines on Employment Selection Procedures and that all validation studies be performed by means of empirical, criterion-related validation techniques insofar as feasible. It also required that the proposed selection procedure be submitted to the plaintiffs for review and to the court for approval prior to its adoption.
 
 
 6
 3. It authorized defendants to request the court's permission for the making of interim appointments, with the provision that members of the plaintiff class receive at least one out of every four such promotions until the combined percentage of Black and Hispanic sergeants was equal to the combined percentage of Black and Hispanic correction officers.
 
 
 7
 4. It required that, following the development and court approval of revised selection procedures, defendants continue to promote at least one Black or Hispanic employee for each three white employees promoted until the combined percentage of Black and Hispanic sergeants was equal to the combined percentage of Black and Hispanic correction officers.
 
 
 8
 5. It awarded attorney's fees to plaintiffs as part of their costs, retaining jurisdiction in the court to determine the amount thereof.
 
 
 9
 Defendants have appealed from this order, contending primarily that examination 34-944 was job-related and therefore not unconstitutionally discriminatory; that the court erred in requiring future examinations be criterion-validated; that the imposition of promotion quotas was unjustified and constituted reverse discrimination; and that the award of attorney's fees was improper.
 
 
 10
 By order to show cause dated April 23, 1974, Albert M. Ribeiro and Henry L. Coons, correction officers who had taken and passed examination 34-944, sought leave to intervene as parties defendant on behalf of themselves and a class of similarly situated correction officers, alleging that they were indispensable parties, since the relief sought by plaintiffs would deprive them of their personal and property rights without due process of law. This motion was granted, with the proviso that intervenors could not litigate any matters which they might have litigated had they been parties from the outset. Intervention was also limited to the petitioners as individuals and not as representatives of a class.
 
 
 11
 Intervenors also appeal from the final order and decree, urging as additional error that they should have been joined at the outset as indispensable parties. Since this latter contention involves the litigation at its inception, we will address ourselves to it first.
 
 DISMISSAL FOR NON-JOINDER
 
 12
 Intervenors' claim of indispensability is grounded upon the provisions of the New York Civil Service Law, Consol.Laws, c. 7. The office of correction sergeant is in the competitive class under such law.[3] Article 5, Section 6, of the New York Constitution requires that appointments and promotions in the Civil Service "shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive".
 
 
 13
 The Civil Service Law, following the mandate of the Constitution, requires the taking of competitive examinations and the appointment and promotion to covered positions from eligible lists promulgated from the results of such examinations.[4] Appointment or promotion is generally required to be made from one of the three persons standing highest on the eligible list.[5] When there is no appropriate eligible list available, provisional appointments or promotions are authorized, pending the creation of a new list;[6] and provisional appointees secure certain benefits which may be applied against future permanent appointments.[7]
 
 
 14
 The eligible list from the examination preceding 34-944 became exhausted in the Spring of 1972, and intervenors, together with some members of plaintiff class, received provisional appointments to correction sergeant. Intervenors were among the ninety persons who had passing scores on examination 34-944, and it was expected that all ninety would receive permanent appointments as sergeant. Such appointments were prohibited, initially by the District Court's temporary restraining order and finally by the order and decree appealed from.
 
 
 15
 That the intervenors were adversely affected by such orders can hardly be gainsaid.[8] However, this in itself is not determinative of their right to be joined as indispensable parties. When litigation seeks the vindication of a public right, third persons who may be adversely affected by a decision favorable to the plaintiff do not thereby become indispensable parties.[9]
 
 
 16
 It may be that because of the "reverse discrimination" aspects of this case which will be discussed hereafter, intervention with the right to participate in the trial would have been appropriate if timely request therefor was made.[10] However, that question is not before us. We hold that intervenors' argument that the complaint should have been dismissed because they were not joined as indispensable parties could not be made for the first time one year after the trial had been completed. At that late date, the test of "equity and good conscience" foreclosed any such rights which intervenors might possibly have had.[11]
 
 
 17
 That intervenors were aware of the litigation at its inception was clearly shown by the fact that the District Court's preliminary injunction prohibited their appointments. The orderly processes of justice do not permit that, with such knowledge, they may stand idly by until after an adverse decision is rendered.[12]THE CONSTITUTIONALITY OF THE EXAMINATION
 
 
 18
 Proof in employment discrimination cases proceeds from effect to cause. Plaintiffs establish the racially disparate consequences of defendants' employment practices, and defendants must then justify such consequences on constitutionally acceptable grounds.[13]
 
 
 19
 Plaintiffs herein contend that examination 34-944 had a disproportionate impact upon minority correction officers, and that defendants must therefore establish that the subject matter of the test bore a meaningful relationship to the duties of the office for which the test was given, i. e., that it was "job-related".[14]
 
 
 20
 The figures relied upon by plaintiffs are recited above; 30.8% of the Whites who took examination 34-944 passed, as contrasted with 7.7% of the Blacks and 12.5% of the Hispanics. Defendants, while not disputing the accuracy of these figures, contend that most of the racial disparity occurred at Ossining Prison which employs the largest group of minority correction officers and urge that any attack upon the examination should be limited to the employees at that institution. Defendants say that either there was no disparity at all at the other correction facilities or else that so few officers were tested at such facilities that no meaningful conclusions could be reached from the test results.
 
 
 21
 This argument completely overlooks the identity of job classifications in the State's penal institutions, the Statewide scope of examination coverage, and the mobility of employees throughout the correctional system. It also ignores the fact that the examination grades for minorities were uniformly lower at all of the State's facilities.
 
 
 22
 The District Court's refusal to fractionalize the examination by varying its application among the correctional facilities was therefore not clearly erroneous.
 
 
 23
 The District Court was likewise not convinced by defendants' argument that the results of the five sub-tests comprising examination 34-944 did not show a consistent racial disparity, particularly when broken down among the different correctional facilities. Since passing grades and promotion were dependent upon the cumulative results of the five sub-tests, we too see little relevance in this proof on the issue of whether or not the examination as a whole had an unconstitutional discriminatory impact.[15]
 
 
 24
 In Vulcan Society of the New York City Fire Department, Inc. v. Civil Service Commission, 490 F.2d 387 (2d Cir. 1973), we stated that racially disproportionate impact need not be proven with complete mathematical certainty. Within the broad outlines of that rule, the District Court's holding that examination 34-944 had such disproportionate impact was not clearly erroneous. Defendants were therefore properly put to their proof to establish the job-relatedness of the examination under attack.
 
 
 25
 The District Judge's decision that defendants had not met the heavy burden thus imposed upon them was based largely upon his conclusion that the procedures employed in constructing examination 34-944 did not conform to professionally acceptable and legally required standards. Specifically, the District Judge held that the defendants had not performed an adequate job analysis and had too routinely followed the pattern of past practices. This approach was approved by us in Vulcan, supra, where we said that it was unnecessary for the trial judge to bury himself in a question-by-question analysis of the test.
 
 
 26
 Of course, the trial judge could not confine himself to an examination of the process of preparation while completely ignoring the merit of the result. However, since insufficient spadework usually results in a poor garden, evidence of unsatisfactory preparation imposed upon the defendants a heavier burden of demonstrating that they had created a satisfactory job-related examination.
 
 
 27
 The District Judge, without going into great detail, pointed out that certain items on the test involved guidelines that a correction sergeant would have no need to apply. He showed that the five sub-tests and their component parts were not weighted to reflect the relative importance of the job-related attributes being tested. He considered the expert testimony submitted by both sides and stressed the fact that neither expert would characterize the examination as job-related.
 
 
 28
 We hold that Judge Lasker's finding that defendants had failed to carry their heavy burden of establishing the job-relatedness of examination 34-944 was not clearly erroneous, and we move to the question of the relief granted.
 
 NEW TESTING PROCEDURES
 
 29
 Having declared examination 34-944 unconstitutionally invalid, the District Judge ordered the development of a "lawful non-discriminatory selection procedure". He also required that such procedure be validated in accordance with the E.E.O.C. Guidelines on Employment Selection Procedures[16] and that such validations be performed by means of empirical criterion-related validation techniques insofar as feasible.
 
 
 30
 In Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission, 482 F.2d 1333 (2d Cir. 1973), and again in Vulcan, supra, we described the several techniques for proving the validity of testing procedures which are professionally designated "empirical", "construct" and "content", and we see no need for further description in this opinion. In Vulcan, we went a step further. We said:
 
 
 31
 "The Fourteenth Amendment no more enacted a particular theory of psychological testing than it did Mr. Herbert Spencer's Social Statics. Experience teaches that the preferred method of today may be the rejected one of tomorrow. What is required is simply that an examination must be 'shown to bear a demonstrable relationship to successful performance of the jobs for which it was used.' "
 
 
 32
 However, since our decision in Vulcan, the Supreme Court in Albemarle Paper Co. v. Moody, --- U.S. ---, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), has strongly endorsed the procedures outlined in the E.E.O.C. Guidelines which provide that evidence of content or construct validity may be appropriate "where criterion-related validity is not feasible"[17] While Albemarle is distinguishable from the instant case in that it is a Title VII action involving a private industrial employer, we think the District Court's similar preference for the E.E.O.C. Guidelines was not clearly erroneous.[18]
 
 
 33
 We do not construe the order of the District Court as going beyond the provisions of the Guidelines by requiring empirical validation regardless of feasibility. It seems clear that the problems involved in civil service testing are substantially different from those which confront a private employer who tests on a limited and non-competitive basis. These problems will, we are sure, be considered by the District Court should a dispute hereafter arise as to whether appellants' testing procedures have been empirically validated "insofar as feasible".
 
 
 34
 The District Court ordered that the new test prepared by defendants be submitted to the plaintiffs for review. We find this requirement difficult to comprehend. Presumably, this examination will be taken by members of the plaintiff class in competition with others. Permitting advance review by plaintiffs would place all others at a competitive disadvantage.[19] If the District Judge is seeking professional assistance from plaintiffs' expert, his order should so provide; and proper steps should be taken to insure confidentiality.
 
 THE IMPOSITION OF QUOTAS
 
 35
 One of the most controversial areas in our continuing search for equal employment opportunity is the use of judicially imposed employment quotas.[20] The replacement of individual rights and opportunities by a system of statistical classifications based on race is repugnant to the basic concepts of a democratic society.
 
 
 36
 The most ardent supporters of quotas as a weapon in the fight against discrimination have recognized their undemocratic inequities and conceded that their use should be limited.[21] Commentators merely echo the judiciary in their disapproval of the "discrimination inherent in a quota system.[22]
 
 
 37
 Our court has approached the use of quotas in a limited and "gingerly" fashion. In United States v. Wood Lathers, Local 46, 471 F.2d 408 (2d Cir.) cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973), we approved an order based upon a consent decree which directed a union to issue a quota of work permits to minority workers. In Bridgeport, supra, we approved the use of hiring quotas for the Bridgeport Police Department. In Vulcan, supra, we affirmed an interim order for quota hiring of New York City firemen "only because no other method was available for affording appropriate relief without impairing essential city services". 490 F.2d at 398. Rios v. Enterprise Association Steamfitters Local 638, 501 F.2d 622 (2d Cir. 1974), imposed a specific racial membership goal upon a union. In Patterson v. Newspaper Deliverers' Union, 514 F.2d 767 (2d Cir. 1975), we approved a settlement which also involved union membership with an imposed quota system for the union's group classification system. In each of these cases, there was a clear-cut pattern of long-continued and egregious racial discrimination. In none of them was there a showing of identifiable reverse discrimination. In the instant case, there is insufficient proof of the former and substantial evidence of the latter.
 
 
 38
 This is a class action brought on behalf of one hundred seventeen persons who took and failed examination 39-944 or who passed but ranked too low to be appointed. The class was so designated by the District Court which found that the question of whether examination 34-944 discriminated against minority candidates was the question of law common to the class. The existence of such common question of law or fact was, of course, a prerequisite to the maintenance of a class action.[23]
 
 
 39
 At the outset of the trial, the District Judge indicated his desire to decide the case on the basis of 34-944 alone, and it is clear that the trial proceeded substantially on that basis. Some incomplete, and therefore unreliable, data were submitted with regard to the previous examination given in 1970, but plaintiffs concede, as they must, that there are no data in the record with respect to pre-1970 tests. There was proof of some present racial imbalance among supervisory correction personnel, but this had little probative value without statistical background data concerning the eligible correction officer labor pool from which minority supervisors could have been drawn. The testimony is undisputed that the duties of a correction sergeant have changed substantially over the years so that no retroactive inference concerning job-relatedness could be made as a result of examination 34-944, which was evaluated in relation to the job as it then existed. Finally, although this is not dispositive of the matter, there is no claim that defendants at any time acted without the utmost good faith or with intention to discriminate.
 
 
 40
 A comparison of respondent's proof with that considered by then District Judge Mansfield in Chance v. Board of Examiners, 330 F.Supp. 203 (S.D.N.Y.1971), aff'd, 458 F.2d 1167 (2d Cir. 1972), is illuminating. Judge Mansfield's opinion shows that he reviewed the pass-fail statistics from fifty supervisory examinations taken by six thousand, two hundred one candidates over a seven-year period to ascertain the relevant racial and ethnic groupings. In the instant case, the litigation centered on one. As District Judge Weinfeld pointed out in the lower court opinion in Vulcan, 360 F.Supp. 1265, 1271 (S.D.N.Y.1973), the consequence of relying upon one examination is "that any finding of discrimination and the relief to be granted will necessarily be restricted to the scope of the proof."
 
 
 41
 In view of the limited scope of the issues framed in this class action and the paucity of the proof concerning past discrimination, we feel that the imposition of permanent quotas to eradicate the effects of past discriminatory practices is unwarranted.[24]
 
 
 42
 Moreover, once defendants have prepared a court-approved job-related civil service examination, a deliberate misuse of the resultant eligibility list on racial grounds would seem to be violative of both the New York and the Federal Constitutions.
 
 
 43
 Civil service laws, like civil rights laws, were enacted to ameliorate a social evil. In the former case, it was the spoils system; in the latter, discrimination. To the citizens of the State of New York, civil service was sufficiently important that they mandated its use by their constitution.[25] In so doing, they "declared in unmistakeable terms that merit, ascertained as therein provided, shall govern appointments and promotions in the public service",[26] and that merit must be ascertained as far as practicable by competitive examination.[27]
 
 
 44
 The Congress recognized the social benefits inherent in a system of promotion based upon merit when it provided that "it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system".[28] As pointed out by the Court in Griggs, supra, Congress did not intend "to guarantee a job to every person regardless of qualifications".[29]
 
 
 45
 The attack upon the content of civil service examinations, illustrated by Vulcan and Bridgeport, merely heralds future confrontations between the advocates of equal employment opportunities and the supporters of our civil service system. In the offing, surely, is an attack upon the provisions of § 61 of the New York Civil Service Law which requires that appointment from an eligible list be made from one of the three persons standing highest on the list. It seems to us that the judiciary should act with great reluctance in undermining traditional civil service concepts; and, if a decision is to be made to subordinate the social purposes of civil service to those of equal employment opportunity, that decision should be made by the people speaking through their legislators.
 
 
 46
 The courts of New York hold that one whose efforts secure for him a position upon a civil service promotion list "is entitled to consideration and protection in such position".[30] Whether this governmental benefit be termed a right or a privilege is of no significance; constitutional rights do not turn upon such issues.[31]
 
 
 47
 So long as civil service remains the constitutionally mandated route to public employment in the State of New York, no one should be "bumped" from a preferred position on the eligibility list solely because of his race.[32] Unless the Fourteenth Amendment is applicable only to Blacks, this is constitutionally forbidden reverse discrimination.[33]
 
 
 48
 The smaller the group participating in a civil service examination, the more pointed the problem becomes. We can no longer speak in general terms of statistics and class groupings. We must address ourselves to individual rights.
 
 
 49
 A hiring quota deals with the public at large, none of whose members can be identified individually in advance. A quota placed upon a small number of readily identifiable candidates for promotion is an entirely different matter. Both these men and the court know in advance that regardless of their qualifications and standing in a competitive examination, some of them may be by-passed for advancement solely because they are white. As to such a situation, the following comments of Judge Mulligan in Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission, supra, are most pertinent:
 
 
 50
 "We are discussing some 117 positions with time-in-grade requirements mandating three years' service as patrolman, sergeant and lieutenant postponing promotion to captain for a minimum of nine years. While this factor will delay those of the minority groups who will become patrolmen, the imposition of quotas will obviously discriminate against those Whites who have embarked upon a police career with the expectation of advancement only to be now thwarted because of their color alone. The impact of the quota upon these men would be harsh and can only exacerbate rather than diminish racial attitudes."[34]
 
 
 51
 We turn now to the remedial relief ordered by the District Court, which is both interim and final in nature. As interim relief, the court ordered that if defendants wished to make any appointments pending the development of a new selection procedure, they might apply to the court for permission to do so. The court directed that at least one out of four of the persons so promoted must be members of the plaintiff class. Since this portion of the decree is interim in nature, does not mandate the making of any promotions, does not disregard an existing civil service eligibility list, and since its benefits are limited to the members of the plaintiff class, we affirm it as not being an abuse of the District Court's discretion.
 
 
 52
 Insofar as the order appealed from imposes permanent quota restrictions upon those who seek advancement by means of a court-approved job-related civil service examination, we reverse. The benefits of such order are not limited to the plaintiff class. Its quota requirements are based upon a shifting and rapidly expanding racial base, wholly unrelated to the consequences of any alleged past discrimination. It provides for appointment according to race without regard to the individual applicant's standing on a job-related examination and, indeed, without regard to whether the benefitted Black or Hispanic received a passing grade. It completely ignores the statutory requirements and constitutional purpose of the New York Civil Service Law and constitutes court-imposed reverse discrimination without any exceptional or compelling governmental purpose.[35]
 
 PROVISIONAL APPOINTMENTS
 
 53
 At the outset of the litigation, the District Court issued a temporary restraining order prohibiting defendants from terminating provisional appointments which had been made to members of the plaintiff class. The terms of this order were carried over into Judge Lasker's opinion but were amended to state that such appointments might not be terminated solely because of plaintiffs' failure to pass examination 34-944. However, they were not incorporated into the final order and decree, and we cannot be sure that the District Court intended them to survive.
 
 
 54
 Appellants argue convincingly that under § 65 of the New York Civil Service Law provisional appointments are made only when there is no appropriate eligible list available for filling a vacancy and that therefore the making of such appointments bears no relationship to the constitutionality of examination 34-944. Appellants also argue that such order was discriminatory in that it applied only to minorities who failed the examination. We need not reach any of the foregoing questions, however, since, as we read § 65, provisional appointments are made only for periods of up to nine months and then terminate automatically unless a new provisional appointment is made. We do not read Judge Lasker's opinion as prohibiting termination for any reason unrelated to the failure to pass the examination or requiring the making of a new appointment at the end of the nine month provisional period.
 
 ATTORNEY'S FEES
 
 55
 The District Court's award of attorney's fees cannot stand.
 
 
 56
 In Stolberg v. Board of Trustees, 474 F.2d 485 (2d Cir. 1973), we laid down the test of "unreasonable, obdurate obstinancy" on the part of the defendant as the determining factor in the award of counsel fees.[36] There is no claim of any such attitude on the part of defendants-appellants. Accordingly, we would have been reluctant to approve the awarding of counsel fees herein. In any event the matter has now been decided for us by the Supreme Court in Alyeska Pipeline Service Co. v. Wilderness Society, ---, U.S. ---, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).[37]DISPOSITION
 
 
 57
 1. We deny intervenors' application to dismiss the complaint.
 
 
 58
 2. We affirm the District Court's order insofar as it invalidates examination 34-944 and directs the preparation of a new non-discriminatory examination procedure.
 
 
 59
 3. We affirm so much of the District Court's order as requires the new testing procedures to be validated by means of empirical criterion-related validation techniques if feasible.
 
 
 60
 4. We reverse so much of the District Court's order as requires the new testing procedure to be submitted to plaintiffs for review.
 
 
 61
 5. We affirm that part of the District Court's order which provides a procedure for interim appointments if desired by defendant.
 
 
 62
 6. We reverse so much of the District Court's order as provides for promotion by quota following the establishment of new civil service testing procedures.
 
 
 63
 7. We reverse that part of the District Court's order which includes counsel fees as part of plaintiff's costs.
 
 
 64
 8. We remand to the District Court for such further orders as are required by and consistent with this opinion.
 
 
 
 [1]
 Although the coverage of Title VII was enlarged in 1972 by the amendment of 42 U.S.C.A. § 2000e(a) to include governments, governmental agencies and political subdivisions, this action was brought under 42 U.S.C. §§ 1981, 1983
 
 
 [2]
 Equal Employment Opportunity Commission
 
 
 [3]
 N.Y. Civil Service Law § 44 (McKinney 1972)
 
 
 [4]
 N.Y. Civil Service Law §§ 52, 61 (McKinney 1972)
 
 
 [5]
 N.Y. Civil Service Law § 61 (McKinney 1972)
 
 
 [6]
 N.Y. Civil Service Law § 65 (McKinney 1972)
 
 
 [7]
 N.Y. Civil Service Law § 52 (McKinney 1972)
 
 
 [8]
 Castro v. Beecher, 459 F.2d 725, 736 (1st Cir. 1972)
 
 
 [9]
 National Licorice Co. v. NLRB, 309 U.S. 350, 366, 60 S.Ct. 569, 84 L.Ed. 799 (1940); National Resources Defense Council, Inc. v. Tennessee Valley Authority, 340 F.Supp. 400 (S.D.N.Y.1971), rev'd on other grounds, 459 F.2d 255 (2d Cir. 1972); Sansom Committee v. Lynn, 366 F.Supp. 1271 (E.D.Pa.1973)
 
 
 [10]
 See, e. g., Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm'n, 482 F.2d 1333 (2d Cir. 1973)
 
 
 [11]
 Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968)
 
 
 [12]
 Rios v. Steamfitters Local 638, 520 F.2d 352 (2d Cir. 1975)
 
 
 [13]
 Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)
 
 
 [14]
 Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm'n, 482 F.2d 1333 (2d Cir. 1973); Vulcan Society of the New York City Fire Dep't, Inc. v. Civil Service Comm'n, 409 F.2d 387 (2d Cir. 1973)
 
 
 [15]
 Vulcan Society of the New York City Fire Dep't, Inc. v. Civil Service Comm'n, 360 F.Supp. 1265, 1272 (S.D.N.Y.1973), aff'd, 490 F.2d 387 (2d Cir. 1973). See note 13, supra
 
 
 [16]
 29 C.F.R. §§ 1607.1 et seq. (1970)
 
 
 [17]
 29 C.F.R. § 1607.5(a) (1970)
 
 
 [18]
 Cf. Douglas v. Hampton, 168 U.S.App.D.C. ---, 512 F.2d 976 (1975)
 
 
 [19]
 Cf. Matter of Fitzgerald v. Conway, 275 App.Div. 205, 88 N.Y.S.2d 649 (3d Dep't 1949); Matter of Belmont v. Kaplan, 16 A.D.2d 605, 229 N.Y.S.2d 888 aff'd 13 N.Y.2d 998, 245 N.Y.S.2d 390, 195 N.E.2d 57 (1963) (mem )
 
 
 [20]
 Note, Constitutionality of Remedial Minority Preferences in Employment, 56 Minn.L.Rev. 842 (1972). See, e. g., Morrow v. Crisler, 491 F.2d 1053 (5th Cir. 1974), cert. denied 417 U.S. 965, 94 S.Ct. 3169, 41 L.Ed.2d 1137 (1974)
 
 
 [21]
 Blumrosen, Quotas, Common Sense, and Law in Labor Relations: Three Dimensions of Equal Opportunity, 27 Rutgers L.Rev. 675 (1974)
 
 
 [22]
 Hughes v. Superior Court, 339 U.S. 460, 467, 70 S.Ct. 718, 94 L.Ed. 985 (1950); see also dissenting opinion of Mr. Justice Douglas in De Funis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), dissenting opinion of Judge Hays in Rios v. Steamfitters Local 638, 501 F.2d 622 (2d Cir. 1974), and concurring opinion of Judge Feinberg in Patterson v. Newspaper Deliverers' Union, 514 F.2d 767 (2d Cir. 1975)
 
 
 [23]
 Fed.R.Civ.Pro. 23(a)
 
 
 [24]
 See Chance v. Board of Examiners, 458 F.2d 1167, 1179 (2d Cir. 1972)
 
 
 [25]
 N.Y.Const. art. V, § 6 (1965)
 
 
 [26]
 Palmer v. Board of Education, 276 N.Y. 222, 226, 11 N.E.2d 887, 888 (1937)
 
 
 [27]
 Matter of Fink v. Finegan, 270 N.Y. 356, 361, 1 N.E.2d 462 (1936)
 
 
 [28]
 42 U.S.C. § 2000e-2(h)
 
 
 [29]
 401 U.S. 424, at 430, 91 S.Ct. 849, at 853, 28 L.Ed.2d 158 (1971)
 
 
 [30]
 Barlow v. Craig, 210 App.Div. 716, 719, 206 N.Y.S. 293, 295 (1st Dept. 1924); Barlow v. Berry, 245 N.Y. 500, 503, 157 N.E. 834 (1927)
 
 
 [31]
 Sugarman v. Dougall, 413 U.S. 634, 644, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973)
 
 
 [32]
 Note Judge Feinberg's concern about "bumping" expressed in United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971)
 
 
 [33]
 "The Constitution voices its disapproval whenever economic discrimination is applied under authority of law against any race, creed or color." Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 209, 65 S.Ct. 226, 235, 89 L.Ed. 173 (1944) (concurring opinion of Mr. Justice Murphy); Commonwealth v. Glickman, 370 F.Supp. 724, 736 (W.D.Pa.1974)
 
 
 [34]
 482 F.2d at 1341
 
 
 [35]
 See Matter of Board of Education v. Nyquist, 31 N.Y.2d 468, 475, 341 N.Y.S.2d 441, 293 N.E.2d 819 (1973)
 
 
 [36]
 See also, Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission, 497 F.2d 1112 (2d Cir. 1974)
 
 
 [37]
 Although an attorney may find lesser professional challenge in a Title VII proceeding than in an action under §§ 1981 and 1983, there are a number of reasons why the former procedure is preferable. The possibility of an award for attorney's fees is now one of them