Winnie TEAL, David Malstrom, Marian Costa, Edith Latney, Rose Walker, Gracie Clack, Jennie Pick, and Linda Brooks, Plaintiffs-Appellants,

v.

STATE OF CONNECTICUT, Department of Administrative Services of the State of Connecticut, Department of Income Maintenance of the State of Connecticut; Elisha C. Freedman, individually and in his official capacity; and Edward W. Maher, individually and in his official capacity, Defendants-Appellees.

No. 444, Docket 80–7675.

United States Court of Appeals, Second Circuit.

Argued Dec. 22, 1980.

Decided March 26, 1981.

Thomas W. Bucci, Bridgeport, Conn., for plaintiffs-appellants.

Sidney D. Giber, Asst. Atty. Gen., State of Conn., Hartford, Conn. (Carl R. Ajello, Atty. Gen., State of Conn., Bernard F. McGovern, Jr., Asst. Atty. Gen., State of Conn., Hartford, Conn., of counsel), for defendants-appellees.

Before TIMBERS and MESKILL, Circuit Judges, and GAGLIARDI, District Judge.*

MESKILL, Circuit Judge:

█ This is an appeal from a judgment entered in the United States District Court for the District of Connecticut, Daly, J., dismissing appellants' action instituted under § 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (1976),[1] for failure to make out a prima facie case of race discrimination.[2] This appeal raises the question whether a plaintiff in a Title VII action may make a prima facie showing of discriminatory impact based upon the disparate results produced by one portion of an employee selection process, where the overall results of the selection process conceded-

---

* Honorable Lee P. Gagliardi, United States District Judge for the Southern District of New York, sitting by designation.

1. Section 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2, provides in pertinent part:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

\* \* \* \* \* \*

(h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice ... for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.

2. Plaintiffs also asserted claims under § 16 of the Civil Rights Act of 1870, 42 U.S.C. § 1981 (1976); and § 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1976). The district court noted that the § 1981 claim was governed by Title VII principles, *see Davis v. County of Los Angeles*, 566 F.2d 1334, 1340 (9th Cir. 1977), *vacated as moot*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979), and thus dismissed the claim for the same reasons it rejected the Title VII claim. Plaintiffs' § 1983 claim was dismissed for a failure of proof on the issue of intent. *See generally Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–71, 97 S.Ct. 555, 562–566, 50 L.Ed.2d 450 (1977). The plaintiffs do not appeal these decisions.

ly reveal no such imbalance. For the reasons stated below, we hold that where a plaintiff establishes that a component of a selection process produced disparate results *and* constituted a pass-fail barrier beyond which the complaining candidates were not permitted to proceed, a prima facie case of disparate impact is established, notwithstanding that the entire selection procedure did not yield disparate results.

## BACKGROUND

The plaintiffs, Winnie Teal, Rose Walker, Edith Latney, and Gracie Clack,[3] are black American citizens employed by the State of Connecticut, Department of Income Maintenance. All four plaintiffs were promoted provisionally to the position of Welfare Eligibility Supervisor and served in that capacity for periods in excess of two years. Several of the plaintiffs' superiors testified at trial that the plaintiffs possessed the qualifications for permanent positions as supervisors and praised their performance on the job.

To attain permanent status as supervisors, plaintiffs had to participate in a selection process which requires, as the first step, a passing score on a written examination. Those candidates who pass the written examination form an eligibility pool from which the appointing authority selects

persons to fill the permanent positions. In making the final determinations the appointing authority considers the past work performance of the candidates, recommendations of the candidates' supervisors, and to a lesser degree, the candidates' seniority. Additionally, in this final step of the process, the defendants employ an affirmative action program to insure a large representation of minority candidates on the supervisory level. However, only if a candidate passes the written examination and enters the eligibility pool will he be exposed to the rest of the selection process and thus benefit from the consideration of these other factors.

■ The written test was administered on December 2, 1978 to 329 candidates. The mean score on the examination was 70.4 percent. However, because the black candidates had a mean score 6.7 percentage points lower than the white candidates, a disparity that the defendants admitted was statistically significant, and because a cutoff score of 70 would have resulted in a disproportionately large number of black candidates failing the exam, the defendants set the passing score at 65.[4] With the passing score set at 65, the following results were obtained:

3. The black plaintiffs were joined by four white plaintiffs, David Malstrom, Marian Costa, Jennie Pick, and Linda Brooks, on a pendent state claim that the written test also violated Conn. Gen.Stat. § 5–219 (1980). That section provides in pertinent part:

> Examinations [for state employees] shall ... fairly test and determine the qualifications, fitness and ability of the persons tested to perform the duties of the class or position to which they seek appointment. Examinations shall be formulated in cooperation with agencies appointing specific classes of employees and shall be competitive .... Examinations may take the form of written or oral tests, demonstration of skill or physical ability, experience and training evaluation, or in the case of promotional examinations, evaluation of prior performance, or any other examination devices deemed appropriate to measure the knowledge, skill or ability required to perform the duties of the job.

All of the plaintiffs appeal from so much of the district court's order and judgment that dis-

misses their pendent claim under § 5–219. The defendants, although not conceding that § 5–219 imposes standards as rigorous as Title VII, nevertheless contend that the test administered to the plaintiffs in this case was sufficiently job-related to pass muster under Title VII. Our decision on the Title VII claim requires this action to be remanded and a job-relatedness analysis to be undertaken under the rigorous EEOC Guidelines. The plaintiffs concede that § 5–219 does not place any greater burden on the defendants than does Title VII. Thus, if the test proves to be job-related under Title VII, we need not reach the question whether the test was valid under § 5–219. We note at this time that the plaintiffs have pointed to no authority whatsoever to support their argument that § 5–219 requires greater scrutiny than that applied by Judge Daly below.

4. Thus, even at this stage of the selection process, the defendants contend that affirmative action considerations are employed.

| Candidate Group | Number | No. Receiving Passing Score | Passing Ratio (%) |
|---|---|---|---|
| Black | 48 | 26 | 54.17 |
| Hispanic | 4 | 3 | 75.00 |
| Indian | 3 | 2 | 66.67 |
| White | 259 | 206 | 79.53 |
| Unidentified | 15 | 9 | 60.00 |
| Total | 329 | 246 | 74.77 |

The above table reveals that the passing rate of the identified black candidates (54.17 percent) was approximately 68 percent that of the passing rate of the identified white candidates (79.53 percent). All four of the plaintiffs received a score on the written examination lower than 65. Faced with these results, the plaintiffs instituted this action claiming that the written exam discriminated against them on account of their race in violation of Title VII. The plaintiffs asserted their Title VII claims below under both the disparate treatment formula and the disparate impact analysis.[5]

More than a year after this action was instituted, and approximately one month prior to trial, the defendants made their first promotions from the eligibility list generated by the written exam. Forty-six persons were promoted to permanent supervisory positions, 11 of whom were black and 35 of whom were white. Of the 48 identified black candidates who entered the selection process, 11, or approximately 23 percent, were promoted; of the 259 identified white candidates who applied, 35, or about 13.5 percent, were promoted. Thus, the actual promotion rate of blacks (23 percent) was approximately 170 percent that of the actual promotion rate (13.5 percent) of identified whites.

The district court initially determined that the plaintiffs' discrimination claims should be evaluated under the disparate impact analysis formulated by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Judge Daly evaluated the results of the selection process under the four-fifths rule of the Uniform Guidelines of Employee Selection Procedures prepared by the Equal

---

**5.** The key distinction between the two types of Title VII actions is that proof of discriminatory motive is required under the former but not the latter. A plaintiff can establish a prima facie case of disparate racial treatment under Title VII by showing

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If the plaintiff succeeds in establishing a prima facie case by a preponderance of the evidence, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. The latter burden on the defendant is one of production, which is met "if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Department of Community Affairs v. Burdine*, — U.S. —, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the defendant, by proof of some legitimate reason for the applicant's rejection, has rebutted the presumption created by the plaintiff's prima facie showing, the plaintiff still "must ... be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext." *McDonnell Doug-*

*las Corp. v. Green, supra*, 411 U.S. at 804, 93 S.Ct. at 1824.

Since "Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation," *Griggs v. Duke Power Co., supra*, 401 U.S. at 432, 91 S.Ct. at 854, Title VII has also been construed as invalidating employment practices that, although neutral on their face, have a disparate *impact upon a protected class.* In a disparate impact case, the plaintiff makes out a prima facie case of discrimination by demonstrating that the employee selection device selects "applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). To rebut a plaintiff's prima facie showing, the defendant must show "that any given requirement [has] a manifest relationship to the employment in question." *Griggs v. Duke Power Co., supra*, 401 U.S. at 432, 91 S.Ct. at 854. Finally, "[i]f an employer does then meet the burden of proving that its tests are 'job related,' it remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.'" *Albermarle Paper Co. v. Moody, supra*, 422 U.S. at 425, 95 S.Ct. at 2375 (quoting *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 801, 93 S.Ct. at 1823).

Employment Opportunity Commission, 29 C.F.R. § 1607.4(D) (1979). The four-fifths rule provides that "[a] selection rate for any race, sex, or ethnic group which is less than four-fifths (⅘) (or eighty percent) of the rate for the group with the highest rate will generally be regarded ... as evidence of adverse impact."[6] While noting that the results of the written test did not satisfy the four-fifths rule, Judge Daly concluded that the results of the *entire* selection process should be used to determine whether the plaintiffs had made out a prima facie case of race discrimination under the disparate impact formula. Since the results of the entire selection procedure actually were more favorable to the black candidates than to the white applicants, Judge Daly dismissed the plaintiffs' action for failure to prove a prima facie case. Thus, the district court found it unnecessary to reach the issue whether the written examination was, indeed, job-related.

## DISCUSSION

The plaintiffs contend on this appeal that the district court erred in using the results of the overall selection process in determining that the plaintiffs failed to make a prima facie showing of disparate impact. Alternatively, the plaintiffs argue that the proof adduced at trial was sufficient to establish a prima facie case under the *McDonnell Douglas* disparate treatment formula. The defendants, on the other hand, maintain that the district court was correct in its decision to dismiss the plaintiffs' complaint and, in any event, contend that the written examination given to the plaintiffs was job-related.

■ Although the disparate impact and treatment analyses are not necessarily mutually exclusive, *see, e. g., Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007 (2d Cir. 1980) (prima facie case established under both analyses), we believe that the district court was correct in evaluating this case

under the disparate impact formula. Contrary to the assertion of the plaintiffs, their qualifications for the permanent supervisory positions were in dispute. Indeed, the resolution of that issue turned directly upon the validity of the written examination. But employers certainly cannot be compelled to come forward and prove the job-relatedness of an eligibility examination upon a plaintiff-employee's bald assertion that he or she is qualified for the position in question. Indeed, since the burden of proof is upon the plaintiff to prove his or her qualifications for the job to establish a prima facie case of disparate treatment, *see McDonnell Douglas Corp. v. Green, supra*, evaluating a case such as the one at bar under that analysis might require placing the burden upon the plaintiffs to prove that the written examination was *not* job-related. We believe that the resolution of the latter issue is best undertaken under the disparate impact analysis that was formulated by the Supreme Court precisely to accommodate cases such as this.

Turning to the disparate impact claim, we conclude that the district court erred in ruling that the results of the written examination alone were insufficient to support a prima facie case of disparate impact in violation of Title VII. While we noted in *Kirkland v. New York State Department of Correctional Services*, 520 F.2d 420, 425 (2d Cir. 1975), *cert. denied*, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976), that proof concerning the disparate impact of certain sub-tests was of "little relevance ... on the issue of whether or not the examination as a whole had an unconstitutional discriminatory impact," there, the passing grade was dependent upon the cumulative results of the sub-tests. Thus, all of the candidates in *Kirkland* were exposed to the challenged selection device in its entirety, and, therefore, were able to benefit from the components of the exam that apparently offset the allegedly discriminatory sub-test. In other words, all of the candidates in *Kirk-*

---

6. While courts are not bound by the EEOC Guidelines, the Supreme Court has declared that the guidelines should be shown "great deference." *Griggs v. Duke Power Co., supra*, 401

U.S. 424, 433–34, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158 (1971); *accord, Albermarle Paper Co. v. Moody*, 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975).

*land* were subjected to the complete selection process, which, when viewed as a whole, did not produce unlawful disparate results. Likewise, in *Smith v. Troyan*, 520 F.2d 492, 497–98 (6th Cir. 1975), *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976), a disparate impact case in which the Sixth Circuit rejected a plaintiff's attempt to fragment a selection process in an effort to challenge a written "General Classification Test," the passing score was cumulative.

■■■■ Viewing the overall results of a selection process ordinarily is a prudent course to pursue, since it places the burden upon the defendant to demonstrate job-relatedness only in situations in which courts can determine with some degree of certainty that a selection device has discriminatorily denied an employment opportunity to members of a protected class. Where all of the candidates participate in the entire selection process, and the overall results reveal no significant disparity of impact, scrutinizing individual questions or individual sub-tests would, indeed, "conflict[ ] with the dictates of common sense." *Kirkland v. New York State Department of Correctional Services*, 374 F.Supp. 1361, 1370 (S.D.N. Y.1974), *aff'd*, 520 F.2d 420 (2d Cir. 1975). Where, however, an identifiable pass-fail barrier denies an employment opportunity to a disproportionately large number of minorities and prevents them from proceeding to the next step in the selection process, a different result must obtain. Otherwise we would be adopting the position that, regardless of the language of the statute, Congress intended Title VII to protect faceless groups rather than individuals. Title VII cannot be interpreted to permit an obvious denial of employment opportunities to candidates that is solely attributable to non-job-related characteristics they possess that are incident to their race.[7]

In *Brown v. New Haven Civil Service Board*, 474 F.Supp. 1256 (D.Conn.1979), the case upon which the defendants principally rely, Judge Newman, then sitting as a district court judge, was confronted by the same issue presented in this case in a similar factual setting. In *Brown*, the plaintiffs alleged that of the 99 blacks who had taken a written employment examination, only 30 passed, whereas 120 of the 194 whites passed. Thus, as to that part of the selection process, the passing rate for blacks was less than half the passing rate of whites. The results of the entire selection process, however, revealed no significant disparity between the actual hiring rates of blacks and whites. Judge Newman held that the plaintiffs could not dissect the overall selection process and challenge the disparate results of one of its components where the final results of the selection procedure did not produce disparate results in actual hiring. Judge Newman advanced two principal bases for this holding. First, he suggested that to

> examine each component of an entire application process [would] launch[ ] a court on a course that has no boundaries and no clear end. . . .

> [E]ven if only one question has a disproportionate impact on a minority group, an individual who answers that question incorrectly and then fails by one point to accumulate the minimum required score for hiring can argue that he has been the victim of discrimination in the hiring process. The prospect of a court's examining subtests, sub-subtests, and even individual questions within test segments argues in favor of examining only the end result of an entire hiring process.

*Id.* at 1262. Second, Judge Newman contended that Title VII should not be interpreted to prohibit employers from adopting voluntary affirmative action programs:

> Specifically, Title VII should not be construed to prohibit a municipality's using a hiring process that results in a percentage

---

7. As Justice Powell concisely stated in *McDonnell Douglas Corp. v. Green, supra*, "*Griggs* was rightly concerned that childhood deficiencies in the education and background of minority citizens, resulting from forces beyond their control, not be allowed to work a cumulative and invidious burden on such citizens for the remainder of their lives." 411 U.S. at 806, 93 S.Ct. at 1826.

of minority policemen approximating their percentage of the local population, instead of relying on the expectation that a validated job-related testing procedure will produce an equivalent result, yet with the risk that it might lead to substantially less minority hiring.

*Id.* at 1263.

With respect to the first contention that courts should not be burdened with having to evaluate the allegedly disparate impact that an isolated sub-test or question might have had, we think that Judge Newman's concern in that regard is justifiable only in connection with cases that might involve a challenge to a disparate "subscore" that was subsumed in a non-disparate, cumulative, overall score. While it is difficult to conceive of how the dry scores of a multi-component selection process could discriminate in part, but not in the aggregate, without the influence of some affirmative action effort designed to achieve the non-discriminatory overall result, in such a case the multi-component selection process would by necessity have to include some internal mechanism that offsets the disparate impact caused by the ·discriminatory component. Since *all* of the candidates in such a process would have been afforded the opportunity to receive the benefit of the offsetting mechanism, however, the overall results of the process should be deemed a fair barometer of the fairness of the process.

Where a selection process contains a discriminatory pass-fail barrier, however, we see little justification for judicial restraint. In the case of the pass-fail barrier, both the discriminatory component and the affected individuals are readily identifiable. Courts are under an obligation to entertain the claims of individuals who have been victimized by a discriminatory pass-fail barrier, notwithstanding any belated "corrective" action taken by the employer. In such cases only those candidates who do not bear the incidences of their racial group would surmount the discriminatory barrier and benefit from the corrective, affirmative action measure.

Nor are we persuaded that construing Title VII to invalidate a selection process that includes an affirmative action component to insure non-disparate overall results will frustrate the general objective of achieving racial balance in the workforce. While Title VII may *permit* voluntary affirmative action in some instances, *see United Steelworkers of America v. Weber,* 443 U.S. 193, 200, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979), the statute was never intended to be interpreted as an affirmative action device. Indeed, § 703(j) of Title VII expressly provides that Title VII shall not be "interpreted to *require* any employer . . . to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist" in that respect in the employer's workforce. 42 U.S.C. § 2000e-2(j) (1976) (emphasis added). But more specifically, an employer's adoption of affirmative action policies has never been held by the courts to relieve the employer of liability under Title VII to persons who were injured by the employer's previous discriminatory conduct. In *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 341–42, 97 S.Ct. 1843, 1857–1858, 52 L.Ed.2d 396 (1977), the Supreme Court stated:

> The company's later changes in its hiring and promotion policies could be of little comfort to the victims of the earlier post-Act discrimination, and could not erase its previous illegal conduct *or its obligation to afford relief to those who suffered because of it.*

*Id.* (emphasis added). *See also Furnco Construction Corp. v. Waters,* 438 U.S. 567, 584, 98 S.Ct. 2943, 2953, 57 L.Ed.2d 957 (1978) (opinion of Marshall, J.). Indeed, "[a] racially balanced work force cannot immunize an employer from liability for specific acts of discrimination." *Id.* at 579, 98 S.Ct. at 2950. In the case at bar, an employee selection device produced a readily discernible disparate impact upon the black candidates. The affirmative action effort taken by the defendants at the end of the process was

"of little comfort" to the candidates who were not permitted to proceed beyond the allegedly discriminatory pass-fail barrier.

 Title VII was designed to protect the rights of individuals. "It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for *each* applicant regardless of race . . . ." *Furnco Construction Corp. v. Waters, supra,* 438 U.S. at 579, 98 S.Ct. at 2951. "[A] primary objective of Title VII is prophylactic: to achieve equal employment opportunity and to remove the barriers that have operated to favor white male employees over other employees. . . . An equally important purpose of the Act is 'to make persons whole for injuries suffered on account of unlawful employment discrimination.' " *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 364, 97 S.Ct. at 1869, 52 L.Ed.2d 396; (quoting *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed. 280 (1975)). Permitting the overall selection process result in this case to validate what may be the denial of an employment opportunity to a disproportionate number of black candidates is an expedient that transgresses the purpose of Title VII. Where an employment practice forecloses a disproportionate number of persons in a protected group from a job opportunity, it matters very little to the victimized individuals that their group as a whole is well represented in the group of hirees. "[G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." *Griggs v. Duke Power Co., supra,* 401 U.S. at 432, 91 S.Ct. at 854.

Since Judge Daly determined that the plaintiffs failed to establish a prima facie case of disparate impact under Title VII, he evidently thought it unnecessary to reach the question of the job-relatedness of the written examination, even though this issue had been fully tried. Of course, we make no comment on the resolution of that issue. On remand, the district court should evaluate the job-relatedness of the written examination in accordance with the EEOC Guidelines deferred to by the Supreme Court in *Albermarle Paper Co. v. Moody, supra,* 422 U.S. at 430–31, 95 S.Ct. at 2377–2378. *See* 29 C.F.R. pt. 1607 (1979). This panel will retain jurisdiction of any appeal from the district court's decision on that issue.

The judgment of the district court is reversed and this action is remanded for further proceedings consistent with this opinion.